The next case is United States v. Jackson. The first point I wanted to argue was the denial of the motion to sever the cases. I believe that severance should have been granted in this case. I acknowledge that joint trials are preferred and that judicial economy is something to be valued. And I understand in this particular case the government had witnesses literally from around the world. So I understand all of those concerns are important. But if ever there was a case requiring a severance, I believe this was it. Difficult enough to defend against criminal charges brought by the government. It's even more difficult when you have to defend those charges against the person who's sitting across the table from you at the defense table. Well, it's not always the case. I mean, one can show that one's client was not as involved or didn't participate in certain aspects of the evidence. And particularly if there are limiting instructions given, and there were given limiting instructions here. Certainly. Joint trials with different degrees of culpability as among the defendants are very common. I understand that. And, in fact, it's inevitable. No two people can have the same degree of culpability in a particular crime unless they both fired guns simultaneously at a victim. But I think the real problem here was the extent to which the co-defendant not only pointed the finger at Mr. Jackson, but called him names and basically assumed the role of a prosecutor. They did that constantly from opening statements. Couldn't the jury have concluded, and I understand your argument, but couldn't the jury have concluded that Mr. Hurt was a victim of your client's conduct and still accepted your client's defense, which I understood to be that he just didn't understand these transactions and he had no intent to defraud people? But by definition, if the co-defendant Hurt is saying, I'm a victim of my co-defendant Jackson's frauds, he's saying Mr. Jackson is guilty of fraud. You can't be a victim unless there's a perpetrator. So . . . Well, they might have been a victim of negligence. Well, but the co-defendant was not arguing that through defense arguments, testimony. All of the arguments at the trial were Mr. Jackson, and it was very explicit. He's a con man. He's a scam. There's something fishy about him. And the defense, in some ways, was more vigorous in prosecuting Mr. Jackson than the government was, and that's saying a lot. Well, Mr. Hurt didn't get off. That's . . . well, but nevertheless, given the circumstances of this case, you have co-defendant essentially prosecuting Mr. Jackson and emphasizing things that you don't get a limiting instruction for. The government brings in evidence of an uncharged crime or prior crime. Court gives a limiting instruction, but when a co-defendant brings in that evidence, you don't get the limiting instruction. They don't seem to be as limited as the government is, and that goes to the other issue that I just wanted to raise, Mr. Jackson's evidence of his prior criminal conviction. This I believe denied him his right to a fair trial. I think there was too great a risk, too great a danger that the jury would believe that he had a propensity to engage in fraudulent crimes, and that no matter how well-intentioned the trial court was in terms of limiting instructions, it was inevitable that the probative value of that evidence would be substantially outweighed by its prejudice. And also, the manner in which the jury's . . . Scalia, you squarely put the issue of intent to the jury, that this was a complex series of transactions and way over his head, and that he didn't — couldn't follow it and all of that, and therefore he had no insufficient mens rea. Yes. And to the . . . Why isn't that perfect? Why isn't the response to put in a prior fraud conviction? Well, to the extent that that evidence was relevant, I think that the degree to which the government went — the lengths to which the government went to present evidence of that prior conviction totally swallowed up any proper purpose that the evidence may have had. You mean the way they conducted it at the trial, the way they offered it? Well, you have the government calling his . . . Summation or — what do you mean? Well, specifically, I think the most egregious example was calling his probation officer, Mr. Jackson's probation officer, who came into the courtroom and testified to the length of his incarceration, the amount of restitution he'd been required to pay, and even the terms of his supervised release. All of these things could have some slight relevance to Mr. Jackson's criminal intent in the current case, but to the extent that the government went in proving these things, I think was . . . Were you the trial lawyer for . . . No, I was not. Uh-huh. Did — tell me about the level of objections to these various points that you're just making now. Were they objected to? As I recall, trial counsel did object when the government filed a motion pretrial . . . To put in the evidence. Right. But then the question is the — all the embellishments that you're talking about and the way it was presented, was that — there was no objection to that. I don't think that trial counsel objected in particular to the extent to which the government presented such evidence. Of course, trial counsel doesn't realize the extent of it until the trial is over. As it's happening . . . Well, you can understand as it's happening, or you might be able to get a proffer from the government as to — as to what — how it's going to present the evidence. There are all sorts of steps that can be taken. I understand. It could have been handled that way. I don't think it was. Was the probation officer's testimony 404B evidence, or was it evidence of consciousness of guilt? Because as I understood it, really that evidence — that testimony was going to — the defendant concealed his ongoing conduct. From the probation officer. I think to some extent it came under both categories. And I understand why the government was presenting this evidence. And I'm not saying there's zero relevance to it. It's just overly prejudicial. I think to the extent that they went — they went overboard, basically. That's my position. Thank you. Good morning. My name is John Einhorn from New Haven, and I represent Mr. Hurd. I actually represented him as trial counsel also. What I wanted to talk about, if I may, this morning, however, is — is Sentencing Amendment 794. And I don't believe Your Honors were on panels when I've discussed this in the past, but I feel strongly about this. And as the Court knows, Amendment 794 made a radical change in the sentencing in the regards of role — of culpability, a role reduction. It's a — it's a major change. It's a radical change. And even the government, I don't believe, with all due respect, in its brief, understands the significance of this. As the Court knows, previously when you had a defendant looking for a role reduction, he or she would be compared with a fictional universal character somewhere out there in the country. In the — in the instance now of — of Amendment 794, which came into effect before my client was sentenced, I think about six months before, in November of 2015, and he was sentenced, I think, in March of 16, now you're compared only with — with other co-conspirators. And so in this particular case, even the government agrees that — that in terms of — of his involvement, it was to a lesser extent of — than Mr. Jackson. I can go into many details, but in its memorandum, the government at page 95 in its brief says, quote, there is no dispute that Hurt was involved to a lesser extent than Jackson. So the government says that. Roberts, you're saying that we should read, instead of the term minor, we should read the term lesser into the statement. Yes. Yes. This is not a minor role reduction. No, but what you're saying is that a person who — who is a substantial participant and engages in many aspects of the fraud and whose guilt is very clear and — and deals with many of the other characters who are in the fraud is not the — he's not the chauffeur who's driving the person around. He's engaged in the fraud and is — is playing a substantial role, but — but one that's a little bit less than the other one. That's Rule 794. That's the amendment. So you're saying that the amendment says that you take the worst person and everybody else gets a minor role. I'm not sure everybody else. I think I'm — Well, the worst person means the worst person, and everybody else is not as bad. I don't think I'd go there. I think — I think, Your Honor, I would say that if you compared on a case-by-case basis, in this particular case, there is no question that Mr. Jackson was the mastermind. He came up with these phony documents. He found the victims. He made the decision-making. He — he did the planning. He was — he was the mastermind. Was there also a cooperating witness who had a lesser role than — Yes. — than the jury found your client to have? And she got — and she — and she got a — a role reduction as a minor player. I'm not seeking that, though. I — I think that what the government says — I started to read from page 95 of the government's brief. The government says that there's no dispute that Hurt was involved to a lesser extent, and then the government says, but, you know, the district court took care of that because they gave Jackson a four-level enhancement for leadership, and that solved the government's concern about — about the amendment. That's not what the amendment does. What Mr. Jackson gets by way of an enhancement, four levels or less, doesn't help us any. We're entitled to a — to a reduction because our involvement is clearly, obviously, under any facts, and even the government agrees, less culpable, less involved than Mr. Jackson. And so he — he deserves some sort of a reduction. That's — that's — that's what 794 says. And I — I know this Court has — having been here on this argument before, understands the — the issues on that. The only other point I wanted to — I wanted to note is — is the issue about the 1001 charge against my client. He met with agents, and they gave him a trick question, did you meet with people in North Carolina about this case, or about — about loans, and he said no. And he was lying, but they knew. Sotomayor, why is that a trick question? Because they knew the answer to the question. They were just testing him. They knew he — they knew he was there. I mean, it's a trick — nothing tricky about it. Well, they asked him the question knowing the answer, and — and if he lied about it, which he did, then he was — he was essentially — They're not allowed to ask him questions as to which they already know the truth. No, they can — absolutely, they can do it. But the question is, does he get a — does he then charge with making a false statement? In other words, was it material to the investigation by the agents, or did they just ask him this just to test him out to see if — how good — as the government says, how good he might be as — as a cooperating witness? Could they turn him to use him, and could they believe him? Why isn't that a basis for saying it's material? Because it's not — it's not germane or relevant to, I think, the — the investigation itself. In this — in this circuit, as the courts know, there's only one case. It's relevant to whether — whether or not he would be a good witness to testify at this trial, or whether he might lead to other — other defendants in an expanded investigation. I — I — Or whether they would have to call additional witnesses to prove the fact that otherwise he might admit. That — by the way, that North Carolina case was not one of the — the claimed frauds in this particular case. But — but be that as it may, in this circuit, as the Court knows, there's only one case that — that broaches on this subject, and that was a summary order, Foxworth, I believe. And that was — it was — well, it was a summary order. I won't go further than that. And so even though other circuits around the country have addressed it in a little more detail, and district courts have, in this circuit, it's — it's somewhat of an un — except for Foxworth, it's somewhat of an untouched area. But the big issue is, I think my client, who got 60 months, and unfortunately for reasons that nobody understands, ended up in a penitentiary when it was his first offense, and the BOP ignored the district courts suggesting a camp, has been treated very harshly — too harshly, I believe, for this. And what we'd ask for is a re-sentencing so that the Court can apply the dictates of 794. Thank you, Your Honors. May it please the Court. Good morning, Your Honors. My name is Mike McGarry, assistant United States attorney here on behalf of the United States of America. Each of the two defendants have made multiple claims in their briefs and touched upon some of them today in an oral argument, directed both at the proceedings and at the sentencing. With respect to roll, as well as with respect to restitution, and we heard a little bit about severance, and again, 1001, none of — If I could direct your attention to one of the arguments, the Rule 404B evidence. Yes. Could you explain the reason for calling the probation officer and eliciting the facts about how much time he served and what the conditions of his probation were and — Yes. And I was one of the trial counsel below. The other assistant United States attorney is also here in the courtroom with us today. And I think the Court touched upon it in your questions. Separate and apart from the knowledge and intent element of the prior conviction, there the defendant had travel restrictions, and he had to report to his probation officer for his — prior to getting permission to travel. In Government's Exhibit 211, which is in the Government's Appendix at 250, one of the brokers had written, David, Mr. Jackson, occasionally makes business trips, but over the past four months the significantly increased volume of the complex transactions have literally had him glued to his office. That's not a true statement. He wasn't making business trips because he was — had, you know, restrictions on his travel. And if he were making trips, he had to get permission from probation. So that's one of the reasons. Another reason why it was relevant in the sense that he also paid money to something called Reputation Changer, which what would happen in Reputation Changer is this service would make up fake news stories or other information to push any negative stories to the second page of a Google search, so that if any of the potential victims — Can I just draw your attention back to the travel? Sure. So the Government's position at trial was that he wasn't traveling because he had restrictions, and so representations that he was traveling were false? It was kind of both, Your Honor, yes, because the — he did get permission to take a vacation, I believe, to the Maryland Eastern Shore, and ATM withdrawals showed up where he was traveling using victims' money. So the fact that he had asked for permission and gotten permission to travel and then did travel and then victim money was spent through the ATM machines and at a hotel where he was was a factual issue which could tie him to the bank account, which was in the name of a company, which some victim money was spent. So that was one part. So the fact that he traveled helped to establish — or the fact that he told his probation officer that he was going to travel, asked for permission, helped establish that the victim's money was in his hands and spent in the place he traveled to? Correct, in that instance. It also — the fact that he didn't ask for permission and didn't travel to New York City when Mr. Hurt, the other defendant, did go to New York City to meet Mr. McLean, who had traveled from South Africa in order to get a loan, established that these statements from these brokers, who were other participants, not co-conspirators, but participants, were making knowing false statements, because that's not why Mr. Jackson wasn't going to New York. Presumably — and I think it was reason for the jury to conclude — if he were going to travel to New York, if he were going to travel to New York, he would have to tell his probation officer the purpose of his trip. She would then inquire as to what business he was in. And he had certain restrictions because of the large restitution figure that he wasn't to engage in certain financial transactions. He wasn't to take out loans. So, therefore, his not telling his probation — moving a little bit from the travel — his not telling his probation officer about jail and realty capital management and American capital holdings, by not telling her about that, it showed consciousness of guilt, because one would think a defendant would want to tell your probation officer what you're up to. Certainly, also, if you owe a million dollars in restitution and you're making these fantastic loans and you're making these great commissions, maybe you're able to pay more in your court-ordered restitution. Clearly, the millions of dollars that came into his account were not used to pay his restitution because it was not a real job. It was fraud. And so, just wrapping up with your question, Your Honor, it was not simply introduced to show knowledge, intent, absence of mistake, but there were various factual points in the evidence where having the probation officer come proved those factual points. And I would submit, Your Honor, that there was nothing — there weren't embellishments. These were factual evidence that were put in, and there was no improper use of the prior conviction. Can I ask you a question about the rule enhancement? Yes. What's the evidence that the brokers or the escrow agents knew that this was a fraudulent enterprise? You just said that the brokers were participants — Yes, Your Honor. — which must mean that they had — that they're criminally involved in this. Did they know? Did they know that Jackson was on probation? Is there — let me rephrase that. Is there evidence? I don't believe there was evidence, and I don't believe there's evidence induced at trial that they were aware that he was on probation. I will jump to what we put in our brief. In the pre-sentence — in the post-trial proceedings leading to the pre-sentence report. I appreciate that, Your Honor. And I appreciate your pointing that out, because, of course, we know the judge can rely on things beyond what was just in trial. Again, I don't think we established — and I — and there is no evidence, there was nothing presented to the judge as to whether or not they knew he was on probation or whether they knew that he had a felony. What was presented was the fact that they knew what they were saying was false. And what also was presented, that after they made these false statements, they received commissions in the thousands of dollars. And when I say thousands, small thousands compared to the whole fraud. But for instance, on October 5th and 6th, one of the individuals, a Mr. Kept, K-O-E-P, he spoke with Cooper and Veraltis and indicated that he was — they were having — he was having trouble reaching Jackson. He wasn't — his loan wasn't closing, yet approximately a week later, Cooper and Veraltis described Jackson as a superstar to Mr. McLean, the individual from South Africa, and conveyed his competence and his ability, and they basically were talking him up, even the — and they never mentioned the fact that these other broke — these other individuals were having trouble getting loans. There were also statements made, Your Honor — again, I could cite you to Governments Exhibit 211, there's also 212 and 213, which are in the record around G.A. 249 through about 254, where they say, and this is quoting Mr. Cooper, Daniel Veraltis and myself are independent consultants who have been positioned as the originating gatekeepers for Jalen and Brightway. It is our role to filter in new intake. And then they go on to say, thus far, Daniel and myself have enabled David Manns, which is one of the aliases for Mr. Jackson, has enabled David Manns to be perceived as a superstar by his colleagues at Brightway, and we intend to keep it that way. Your Honor, there were no loans. There were no loans closing. So for them to say that they were the gatekeepers and that they were helping him be perceived as a superstar because he was closing loans is just a false statement. They also made statements to the effect of that, you know, Mr. Hurt is the ultimate decider. He's the big boss. It's great that you're going to meet with him in New York because he's going to decide on your loan. They made statements to individuals. The individuals submitted fees, and then they were paid. And no loans ever closed. So based on that evidence, the fact that the judge found him to be a leader was clearly appropriate. Additionally, even if — Why did the judge need to specify which of the brokers and escrow agents that the court was determining to be knowing participants? I'm sorry. I missed the very first word of your question, Your Honor. As I looked at the record, the district court doesn't tell us specifically which of the escrow agents and which of the brokers the evidence supports the finding that they knowingly participated. Correct. I think she wrote that all — or said that all of the evidence presented shows clearly and easily by a preponderance of the evidence that Mr. Jackson was an organizer and leader of this criminal activity that involved five or more participants who identified — I identified earlier. And what she identified earlier was Cooper and Veraltes as brokers. She also identified Kyle Ferguson from the Ferguson Law Group. She also identified Tony Hearthstone from CES, which was the escrow service. And the evidence there, though we talked about the brokers, was that, for instance, a million dollars went to the escrow service, and they were supposed to release it when they got information of approval from both JALIN and from the prospective loan people. In this case, it was RAM, or Runway Asset Management. Yet they released it, and they sent it to Brightway, or they sent it to JALIN. And that happened on, I believe, three occasions. And Anthony Conforti testified. He was from Telluride. It was — they were building some condominiums out in Telluride. He put $300,000 in escrow. He said, do not release it unless you have my signature. Yet they released it. And he never got his money. He never got his loan. The question I have is, in applying a leadership enhancement, is it necessary that the five or more other people all be aware, all be engaged in criminal activity, or can they be unwitting participants? You're exactly right, Your Honor. There's an alternative grounds, and even though Judge Arterton didn't mention it, under Broxmire, if this Court were to find that it was otherwise extensive, the Court could affirm on that grounds, because you've got the brokers. But that's the alternative. Correct. Five or more versus otherwise extensive. The alternative is not criminally knowing versus innocent. Correct. And I think the — and we put in our footnote, I believe it's footnote nine of our brief, what the Court could look to if you were so inclined under Broxmire to use the alternative. You would look at the number of participants, the number of unknowing participants, and the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme, which is CAROZELLA, C-A-R-O-Z-E-L-L-A. So you're really looking at the activities of that particular defendant and the extent to which the defendant is kind of calling the shots. Correct. Keeping some people in the dark, maybe not. Correct. And I think the Court distinguishes from the typical cab driver. I mean, when you have the escrow agent and they're getting sent a million dollars, and then on his say-so, they're releasing the money, that, I believe, is particular to this scheme. It's not the cab driver, as this Court has distinguished. I will say this. I know we're last on the docket. I'm happy to stand here for as long as you want. I know my time is up, but if you have any other questions regarding severance or anything else, I'm happy to answer them. Thank you. Two quick replies to the government. I think when I was listening to the argument regarding Mr. Jackson's prior crime evidence, I just got the impression the points that the government claims it was trying to make through the introduction of that evidence are really kind of insignificant in the context of the charges in this case. So I don't think that it was really worth it or necessary to present this substantial amount of evidence telling the jury that Mr. Jackson has a prior fraud conviction. Try not to let that influence you in this trial where he's being accused of fraud. I think there was just too great a danger of prejudice balanced against what I believe was just too slight probative value of the evidence in question. As far as the leader-organizer role adjustment, I think the government was arguing that the broker and the ESCO agent knew what they were saying was false, but they haven't presented any evidence to support that statement. They might have engaged in brokers, not surprisingly, sometimes exaggerate the quality of the services they're providing. I don't think there's anything unusual about that. I don't think the government really presented sufficient evidence that the participants, the brokers and the ESCO agents, that they were criminally liable. And since that was the basis upon which the district court determined that there should be a four-level increase in the sentencing guideline, I think that was error, procedural error. Thank you. Well, it's tough to do rebuttal when the government doesn't mention your client. But the one thing the government did go into some detail about was just how bad Mr. Jackson really was or is. And I just ask Your Honors to consider that in terms of my 794 request. Thank you. Could you tell me where or when Hurt challenged the amount of restitution that was to be imposed on him? So, thank you, so if I can, before I get to that, so the government first came up with a large amount, $4.5 million, which they assessed against Mr. Jackson, and then the amount they assessed against my client was about half of that, which, again, shows the relative culpability of the two of them. In terms of my objections to it, we went back and forth with the government, and the final list that they had purportedly just included matters upon which my client might have had some involvement as opposed to anything that Mr. Jackson did. So, the objections at the time, I think, were made during sentencing, but no further. Was there any objection in a pre-sentencing letter or memorandum? Yes. Yes, there was. My pre-sentence memorandum went into detail about objecting, and I think the government, it was after that that the government came up with its list at 2.255 against my client. After that, the government, the amount came down? Yes, it did. And was there an objection to the amount that was actually imposed? No, Your Honor. No. Okay. Thank you. Thank you all. And that is the last case on the calendar this morning, so I'll ask the Clerk to adjourn court. Court is adjourned.